***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Hall and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Hall.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. The parties are properly named in the caption.
2. An employee/employer relationship existed between plaintiff and employer on February 9, 2001.
3. CNA Insurance Company was the carrier on the risk for Humphrey Heating Air Conditioning.
4. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
5. All parties are properly before the Commission for hearing and the Commission has jurisdiction of the parties and subject matter.
6. Plaintiff's average weekly wage will be determined from an I.C. Form 22 wage chart provided by employer/carrier at the time of the hearing before the Deputy Commissioner.
7. The issues before the Commission are:
 Whether plaintiff was injured by accident while in the scope of his employment on or about February 9, 2001;
 Whether plaintiff is entitled to temporary total disability, permanent partial disability, medical bills paid, and ongoing medical treatment for injuries sustained; and,
 Whether Plaintiff is entitled to reasonable attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On February 9, 2001, plaintiff was employed as a plumber for defendant. Plaintiff was working for defendant in Beulaville, North Carolina, on the Meadow Crossing Apartment Project, along with his project superintendent, Roy Melton, and several other plumbers. The crew was installing all of the plumbing for the entire site.
2. On February 9, 2001, Ferguson Enterprises delivered to the site four handicap bathtubs, each weighing between 200 to 400 pounds. The tubs were delivered just before lunchtime, so the crew moved the tubs off the back of the delivery truck and out of the way until after lunch. Later, the crew carried the tubs into the apartment units for installation. Plaintiff and Jeff Mills flipped over one tub and proceeded to carry it into an apartment unit. Plaintiff lead the way and stepped up first into the unit. As Mr. Mills stepped up to follow plaintiff into the unit, the tub pushed forward causing plaintiff's foot to slip. Plaintiff felt a pull in his back, but maintained his grip on the tub so that it would not fall. Plaintiff felt immediate pain in his back that shot down the posterior of his leg, but thought he had just pulled a muscle in his back.
3. Plaintiff continued to work the rest of that day, which was Friday, and rested over the weekend. On Monday, February 12, 2001, plaintiff went to work and worked the whole day. Plaintiff spent part of the day hooking the drain lines to the tubs. He was still having back pain that day, so plaintiff went to Snead's Ferry Clinic on his way home from work. Plaintiff presented to Dr. Warren complaining of lower back pain with some burning down his leg.
4. Plaintiff told Dr. Warren on Monday, February 12, that he was hurt the week before and that the pain had worsened over the last three days. Friday, February 9, would be the week before, and Saturday, Sunday, and Monday would be the three days in which the pain was worse, since plaintiff did not see Dr. Warren until after work on February 12. Dr. Warren's notes from plaintiff's February 12, 2001, appointment indicate that plaintiff "felt back pull burning pain while moving a bathtub at work last week. Worse pain last 3 days." This note corroborates Plaintiff's testimony regarding when the injury by accident occurred. Dr. Warren testified when asked about when the triggering event occurred, "I can only say that it was prior to February the 12th." Later in his deposition testimony, Dr. Warren stated that the February 9 date of injury given by plaintiff did not make sense because plaintiff had told Dr. Warren's office that it had happened a week before. The Full Commission finds this statement by Dr. Warren lacks credibility, based on the fact that Dr. Warren's own notes from that office visit indicate that plaintiff said his injury by accident occurred last week as opposed to a
week ago.
5. Dr. Warren examined plaintiff and found him to have varied tenderness in the right lower back and a positive straight leg-raising test. Plaintiff was injected with Celestone, which is a cortisone steroid, and Xylocaine, and given a pain medication. Plaintiff did not have any x-rays done that day due to the clinic's x-ray machine being out of order. Nothing in plaintiff's medical records prior to February 12, 2001, indicated a positive straight leg-raising test, which Dr. Warren found to be significant. Dr. Warren thought this to be a case of plaintiff having degenerative disc disease and that the lifting of the bathtub was what caused the disc to protrude. Plaintiff was scheduled for an x-ray three days later and scheduled to see the orthopedic surgeon, Dr. Langley.
6. Dr. Langley believed plaintiff had a ruptured disc with radiculopathy of the right leg, signifying pressure on the sciatic nerve roots. Dr. Langley referred plaintiff to Dr. Abraham, a neurosurgeon, and scheduled plaintiff for an MRI of his lower back.
7. Plaintiff continued to show up for work, attempting as much of his duties as he could with the ongoing pain. Plaintiff did not want to have a "lost time" accident and attempted to work through what he still believed was a pulled muscle.
8. Plaintiff's MRI scan revealed a right herniated nucleus pulposus at L5-S1. Dr. Abraham also conducted a physical examination of plaintiff with findings consistent with the findings of the MRI scan. Dr. Abraham recommended immediate surgery, and an L5-S1 microdiskectomy was performed the day after the MRI scan, on February 22, 2001.
9. On February 21, 2001, after speaking with Dr. Abraham, plaintiff called Mr. James Evans, a project manager with defendant. Plaintiff informed Mr. Evans that he had injured himself while carrying a bathtub at work and that he thought it was just a pulled muscle. Plaintiff told Mr. Evans that he would need to have surgery and he would be out of work for a while. Plaintiff asked Mr. Evans to fill out the paperwork for a workers' compensation claim.
10. On April 5, 2001, plaintiff returned to the Sneads Ferry Clinic for pain in his right leg and heel. Dr. Mearns ordered a repeat MRI exam. Plaintiff had an MRI done on April 18, 2001, at Onslow Memorial Hospital, which showed he had either more disc problems or scar tissue on the right side in the lateral recess, but no new disc herniation. Plaintiff still had problems with pressure on the nerve root.
11. On September 10, 2001, plaintiff was referred to Dr. Ira Hardy, an expert in spinal surgery. Based on physical examination and plaintiff's complaints, Dr. Hardy believed that plaintiff had a lumbar disk problem on the right side. An MRI performed on September 24, 2001, showed degenerative changes at the L5-S1 level and a mild to moderate broad-based disk bulge with no evidence of nerve root compression. X-rays were also taken and showed evidence of disk space narrowing, but no instability. Plaintiff's complaints of September 10, 2001, were consistent with the findings in the examination. Plaintiff was taking Oxycontin and Selexa for his pain.
12. Plaintiff underwent two lumbar epidural injections by Dr. Hiram. The first one benefited him, but the second one, given in December 2001, was of no benefit. Plaintiff still had a lot of low back pain and pain down his leg. A myelogram and a post-myelogram CT were performed. The myelogram was essentially a negative examination. However, the post-myelogram CT showed a small paracentral right-sided disk rupture below the disk space with displacement of the S1 nerve root.
13. As a result of the post-myelogram CT, plaintiff underwent a right L5-S1 redo laminotomy with a S1 neurolysis and excision of the recurrent extruded disk. At the time of hearing before the Deputy Commissioner, plaintiff was still being treated by Dr. Hardy and continued to be kept out of work by Dr. Hardy. Additionally, plaintiff had not been released to return to work by any of his treating physicians. Plaintiff had been kept out of work since his first surgery with Dr. Abraham on February 22, 2001.
14. Drs. Rufus Warren, Robert Abraham, and Ira Hardy stated, and the Full Commission finds as fact, that plaintiff's accident while lifting the tub in the course and scope of Plaintiff's employment with defendant produced the herniated disk for which he required the two surgical treatments and subsequent medical care. There is no evidence to the contrary.
15. Other coworkers testified to moving the tubs into the units on February 9, 2001, but none of them were certain as to who helped whom move the tubs. There was testimony that they had all assisted each other at various times to move tubs in and around the different job sites. The Full Commission finds plaintiff's account of the incident to be credible.
16. Mr. New, a coworker of plaintiff, testified that defendant did not like lost time due to injuries and that employees were expected to work whenever possible. Mr. Mills, another coworker, testified that he had moved tubs with plaintiff before and that everyone slips from time to time due to the muddy work sites, but that he was not aware of plaintiff slipping on the day in question. Mr. Mills went on to say it was not uncommon for them to have sore backs from the plumbing work, which included digging ditches, drilling holes, and lifting. Mr. Mills stated that general aches and pains were not discussed at safety meetings, and that such aches were not to be reported. This corroborates plaintiff's testimony that he thought his injury was just a pulled muscle that would get better with rest and, additionally, explains why plaintiff did not report his injury to defendant until he learned of the severity of the problem from his doctors.
17. Plaintiff thought his pain was from a pulled muscle and would get better with some rest, and did not want to lose time from work. He did go to see a doctor when the pain worsened, but plaintiff did not realize how serious the injury was until February 20, 2001. Plaintiff had an MRI done on February 19 and was informed by Dr. Abraham on February 20 that he needed surgery, which is when plaintiff reported the incident to his supervisor. Plaintiff's delay in reporting the incident was reasonable under these facts, especially given the fact that plaintiff had back problems years before, which resolved without the need for surgical intervention.
18. Plaintiff's average weekly wage based on the Form 22 wage chart is $459.41, yielding a compensation rate of $306.29.
19. Plaintiff did assist family and friends with clamming and was paid $3,412.25. Plaintiff was able to do this work in his light-duty capacity by having his brothers do any lifting that may have been required.
20. Plaintiff's attorney is entitled to a reasonable attorney's fee in the amount of $750.00 for the defense of this claim on appeal before the Full Commission.
21. This appeal was brought by the insurer. The Full Commission by this Opinion and Award orders the insurer to make payments of benefits, including compensation for medical expenses, to the injured employee.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant on February 9, 2001. N.C. Gen. Stat. § 97-2(6).
2. As a result of the injury by accident, plaintiff suffered from a herniated disk with nerve root impingement requiring two surgeries, physical therapy, lumbar injections, pain medications, and other medical treatment. N.C. Gen. Stat. § 97-2(6).
3. As a result of his compensable injury by accident, plaintiff has been unable to work on a regular basis. Plaintiff is temporarily disabled and entitled to temporary total disability for the period of February 21, 2001, to the present and continuing. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to have defendants pay for all medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure, or lessen the period of disability. N.C. Gen. Stat. § 97-25.
5. Defendants are entitled to a credit for the $3,412.25 in wages that plaintiff earned in 2001. Plaintiff's work with family members clamming did not provide competent evidence that he was capable of earning wages.Gordon v. City of Durham, ___ N.C. App. ___, 571 S.E.2d 48 (2002).
6. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in paragraph 3 above is hereby approved to be deducted from the lump sum due plaintiff and shall be paid by defendant directly to plaintiff's counsel. Thereafter, defendants shall pay every fourth check directly to plaintiff's counsel.
7. Plaintiff's attorney is entitled to a reasonable attorney's fee in the amount of $750.00 for the defense of this claim on appeal before the Full Commission. Since this appeal was brought by the insurer and since the Full Commission by this Opinion and Award. orders the insurer to make payments of benefits, including compensation for medical expenses, to the injured employee, the Full Commission is entitled to order that the cost to the injured employee of this appeal, including therein reasonable attorney's fee to be determined by the Commission, shall be paid by the insurer as a part of the bill of costs. N.C. Gen. Stat. § 97-88.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay temporary total disability benefits at the rate of $306.29 per week from February 21, 2001, to the present and continuing, subject to defendants' credit for $3,412.25. To the extent that disability benefits have accrued, defendants shall pay the amount to plaintiff in a lump sum and, thereafter, defendants shall pay plaintiff weekly, subject to a reasonable attorney's fee. Defendants shall pay interest at 8 per cent per year from January 7, 2002.
2. Defendants shall pay for all medical expenses incurred or to be incurred as a result of plaintiff's compensable injury as may be required to provide relief, effect a cure, or lessen the period of disability.
3. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in paragraph 1 above is hereby approved to be deducted from the lump sum due plaintiff. Defendants shall pay this directly to plaintiff's counsel. Thereafter, defendants shall pay every fourth check directly to plaintiff's counsel.
4. Defendants shall pay the costs, including an attorney fee of $750.00 to plaintiff's counsel pursuant to N.C. Gen. Stat. § 97-88.
This 11th day of February 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER